WESTFED HOLDINGS, INC., et al., Plaintiffs,

and

Federal Deposit Insurance Corporation, Plaintiff–Intervenor,

v.

The UNITED STATES, Defendant.

No. 92–820 C.

United States Court of Federal Claims.

March 22, 2002.

Alan J. Hruska, New York City, for plaintiff Westfed Holdings, Inc.

Ellis Merritt, Jr., Dallas, TX for plaintiff-intervenor, Federal Deposit Insurance Corporation. Robert J. Soffer, Dallas, TX of counsel.

William C. Buckhold, with whom were Stuart E. Schiffer, Acting Assistant Attorney General, Civil Division, David M. Cohen, Director, Jeanne E. Davidson, Deputy Director, U.S. Department of Justice, Washington, DC for defendant. Thomas Reilly, Tonia J. Tor-

natore, Michael DuClos and Robert Leidenheimer, Washington, DC of counsel.

## OPINION AND ORDER

HEWITT, Judge.

This is an action arising out of the passage of the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA) in 1989. Plaintiff Westfed Holdings, Inc. (Westfed) alleges that defendant breached its agreement to forbear from imposing certain regulatory capital maintenance requirements if Westfed acquired Bell Savings and Loan Association (Bell) and merged it with Western Federal Savings and Loan Association (Old Western), a savings and loan institution of Marina Del Rey, California, to form a new thrift also named Western Federal Savings and Loan Association (New Western). Westfed argues that FIRREA breached that agreement. This opinion addresses several dispositive motions.[1] Before addressing those motions, the court describes the transaction and addresses whether either Dennis I. Simon as assignee for the benefit of creditors of Westfed or Federal Deposit Insurance Corporation (FDIC) is properly before the court.

## I. Background: History of the Transaction

Bell was a federally insured savings and loan institution located in San Mateo, California. Second Amended Complaint (Second Am. Compl.) ¶ 22.[2] On July 25, 1985, the Federal Savings and Loan Insurance Corporation (FSLIC) seized Bell and placed its assets in receivership. *Id.;* Non–FDIC Plaintiffs' Proposed Findings of Uncontroverted Fact Submitted in Connection With Their Motions for Partial Summary Judgment (Non–FDIC Pls.' PFUF) ¶ 4.

FSLIC solicited offers for the purchase of the assets and liabilities of Bell on July 10, 1985. Appendix to Non–FDIC Plaintiffs' Motions for Partial Summary Judgment and to the Memorandum of Law in Support Thereof, Including Short Form Summary Sheet, Affidavit of Frederick A.O. Schwarz, Jr., Declaration of Joan Manning, and Documentary Exhibits (Non–FDIC Pls.' MSJ App.) at 806; Appendix to Defendant's Motion for Summary Judgment on Damages and Motion to Dismiss Pursuant to the Statute of Limitations (Def.'s Damages MSJ App.) at 541.

Four bids for the acquisition of Bell were submitted, but FSLIC rejected all four offers. FSLIC again solicited offers for the purchase of Bell's assets and liabilities on June 19, 1986, and received one offer, which was rejected. NonFDIC Pls.' MSJ App. at 806; Def.'s Damages MSJ App. at 541.

On July 10, 1987, FSLIC again solicited offers for the purchase of Bell's assets and liabilities. Def.'s Damages MSJ App. at 541. Five offerors submitted bids, including Bell Holdings, Inc. (Bell Holdings), an affiliate of Westfed[3]. Non–FDIC Pls.' MSJ App. at 231, 304; Def.'s Damages MSJ App. at 539–44. Bell Holdings had been organized by Westfed for the purpose of acquiring Bell. Non–FDIC Pls.' MSJ App. at 243. Bell Holdings proposed that Bell be converted from a mutual company to a stock company and merged into Old Western. *Id.* at 231–32. At that time, the acquisition of Old Western was pending. *Id.* at 248.

On August 22, 1988, the Federal Home Loan Bank Board (FHLBB) approved the conversion of Bell from mutual to stock form, the acquisition of Bell and Old Western by Westfed, and the creation of a new thrift, New Western, to continue the business of Bell and Old Western. Non–FDIC Pls.' MSJ App. at 787–88, 793–94, 798. FSLIC, Westfed, and New Western executed an Assis-

---

1. Westfed's motion for summary judgment on liability; defendant's motion to dismiss several counts of Westfed's Second Amended Complaint; Westfed's motion for summary judgment on several affirmative defenses raised by defendant to Westfed's Second Amended Complaint; the parties' cross-motions for summary judgment on the causation of the seizure of New Western; and defendant's motion for summary judgment on damages.

2. The statements of fact taken from the complaints and proposed findings of uncontroverted fact have not been disputed.

3. Westfed was then known as D.P. Holdings, Inc. For convenience, we refer to D.P. Holdings, Inc. as Westfed.

tance Agreement on September 23, 1988, pursuant to which FSLIC agreed to contribute to New Western an amount equal to the capital shortfall of Bell. *Id.* at 875–76, 896, 948. The same parties executed a Regulatory Capital Maintenance Agreement on September 23, 1988, pursuant to which Westfed and New Western agreed to maintain New Western's net worth at the greater of $110,000,000 or 2% of New Western's liabilities for five years after the execution of the agreement. *Id.* at 956–57; Non–FDIC Pls.' PFUF ¶ 31. The Regulatory Capital Maintenance Agreement required New Western to calculate its net worth in accordance with Generally Accepted Accounting Principles (GAAP). Non–FDIC Pls.' MSJ App. at 956. The parties agreed in the Regulatory Capital Maintenance Agreement that Westfed and New Western would maintain New Western's regulatory capital at the level required by 12 C.F.R. § 563.13(b). *Id.*

In a letter to the chairman of Westfed dated September 21, 1988 (the Forbearance Letter), FHLBB stated that it would forbear from enforcing the regulatory capital requirement of 12 C.F.R. § 563.13 as long as New Western met the net worth requirement set out in the Regulatory Capital Maintenance Agreement. *Id.* at 854. FHLBB also stated that it would deem New Western in compliance with any minimum capital test to which it was subject pursuant to applicable regulations as long as it complied with the contractual capital requirement (provided that such compliance, in FHLBB's view, was consistent with the purpose of the regulations). Defendant's Supplement to Its Motion for Partial Summary Judgment and Its Motion to Dismiss with Appendix (Def.'s Supp. MSJ App.) at 607. As a result of the merger of Old Western and Bell, New Western gained approximately $116 million in goodwill. Defendant's Proposed Findings of Uncontroverted Fact filed on January 4, 2000 (Def.'s Supp. PFUF) ¶ 22.

FIRREA was enacted on August 9, 1989. Pub.L. No. 101–73, 103 Stat. 183 (1989). FIRREA abolished FHLBB and FSLIC and transferred their regulatory functions to the newly created Office of Thrift Supervision (OTS). *Id.* at Title IV §§ 401–406, 103 Stat.

354–363 (amended by Pub.L. 102–233, 105 Stat. 1770 (1991)); *see generally* 12 U.S.C. § 1437 (1990). An OTS Supervisory Agent wrote to New Western on November 13, 1989, stating that new capital regulations would go into effect on December 7, 1989 and directing any thrift that could not meet the new capital standards to submit a capital restoration plan to OTS by January 8, 1990. Non–FDIC Pls.' MSJ App. at 1013. New Western submitted a capital restoration plan to OTS on December 11, 1989. *Id.* at 1015–16. The capital restoration plan stated that New Western believed that it was exempt from the new capital requirements. *Id.* at 1021. OTS wrote to New Western again on January 9, 1990, requesting additional information and stating that FIRREA had "eliminated [New Western's] capital forbearances as outlined in [the Regulatory] Capital Maintenance Agreement." *Id.* at 1102–04. OTS approved the capital restoration plan in March 1990, subject to certain conditions. Second Am. Compl. ¶ 62.

New Western entered into a supervisory agreement with OTS on July 20, 1992. Def.'s Damages MSJ App. at 630. The supervisory agreement provided that New Western would submit plans for the correction of various deficiencies to OTS. *Id.* at 638–39. On March 23, 1993, New Western submitted to OTS a Capital Restoration Plan and Request for Open Assistance, in which New Western acknowledged that it was likely to be subject to seizure in 1993. *Id.* at 699, 708. OTS seized New Western and appointed the Resolution Trust Corporation (RTC) as conservator and receiver on June 4, 1993. Non–FDIC Pls.' MSJ App. at 1142–43.

Westfed, along with New Western, filed its original Complaint (Compl.) in this court on November 30, 1992. Compl. at 1. The Complaint alleged that the passage of FIRREA and the promulgation of implementing regulations breached a contract between Westfed, New Western and the United States for special regulatory treatment of New Western. *Id.* ¶¶ 39–51. On January 8, 1993, all proceedings in this matter were stayed pending the resolution of *Winstar Corp. v. United States*, No. 90–8C, then on appeal before the Court of Appeals for the Federal Circuit.

*See* 979 F.2d 216 (1992). The Federal Circuit's decision in *Winstar* was appealed to the Supreme Court and was ultimately decided on July 1, 1996. 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). On September 3, 1993, the court added Dennis I. Simon, assignee of Westfed's assets for the benefit of its creditors, as a plaintiff. Order of September 3, 1993.

RTC, in its capacity as receiver for New Western, voluntarily dismissed New Western's claims on May 9, 1994. Notice of Voluntary Dismissal Solely With Respect to Plaintiff Resolution Trust Corporation as Conservator for Western Federal Savings Bank at 1. On June 16, 1995, Westfed filed its First Amended Complaint (First Am. Compl.), asserting claims against defendant both on Westfed's own behalf and derivatively on behalf of New Western. First Am. Compl. at 1. The First Amended Complaint stated that Westfed had standing to assert a derivative claim because it was futile to demand that RTC as receiver for New Western bring the claim against defendant. First Am. Compl. ¶¶ 15–22. The substance of the allegations in the First Amended Complaint was otherwise identical to that of the original Complaint, except for the addition of several restitution damage claims. *See id.* ¶¶ 103–116.

On March 26, 1997, the Federal Deposit Insurance Corporation filed a Complaint in Intervention as successor to the rights of New Western. *See* Complaint in Intervention of Plaintiff Federal Deposit Insurance Corporation at 1. Westfed subsequently filed a Second Amended Complaint (Second Am. Compl.), continuing to assert the right to sue derivatively on behalf of New Western despite plaintiff FDIC's Complaint in Intervention. Second Am. Compl. ¶¶ 15–17. The allegations in the Second Amended Complaint were otherwise identical to those in the First Amended Complaint.

## II. Discussion

### A. Motion to Dismiss Standard of Review

Defendant has moved to dismiss Counts V through IX of the Second Amended Complaint under Rule 12(b)(4) of the United States Court of Federal Claims (RCFC) on the ground that those counts do not state claims on which relief can be granted, and under Rule 12(b)(1) for lack of subject matter jurisdiction. Def.'s Mot. Dism. at 5–7. Dismissal under Rule 12(b)(4) is appropriate "when the facts asserted by the plaintiff do not entitle him to a legal remedy." *Boyle v. United States,* 200 F.3d 1369, 1372 (Fed.Cir. 2000). The court "must accept all well-pleaded factual allegations as true and draw all reasonable inferences in [the nonmovant's] favor" when ruling on a motion to dismiss under Rule 12(b)(4). *Id.* When ruling on a motion to dismiss under Rule 12(b)(1), however, the court may consider relevant evidence beyond the pleadings to decide the jurisdictional question if the jurisdictional facts in the complaint are disputed. *See Rocovich v. United States,* 933 F.2d 991, 993–94 (Fed.Cir.1991); *see also Reynolds v. Army and Air Force Exch. Serv.,* 846 F.2d 746, 747 (Fed.Cir.1988) (citing *Land v. Dollar,* 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947)).

### B. Summary Judgment Standard of Review

Summary judgment is warranted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact that might significantly affect the outcome of the litigation is material. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The movant is entitled to summary judgment if the nonmovant fails to make a showing sufficient to establish an element of its case on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must draw all reasonable inferences in favor of the nonmovant. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. When the case is before the court on cross-motions for summary judgment, each motion is evaluated under the same standard. *Cubic Defense Sys., Inc. v. United States,* 45 Fed.Cl. 450, 457 (1999).

C. Real Parties in Interest: Whether Dennis I. Simon is Properly Before the Court

Westfed brought suit on November 30, 1992. On September 3, 1993, the court added Dennis I. Simon as an assignee for the benefit of Westfed's creditors, while permitting Westfed to remain a party in this suit. Order of September 3, 1993. On July 10, 2001, the court requested that the parties address whether Mr. Simon or Westfed was the real party in interest in this case. Order of July 10, 2001.[4]

Westfed filed a brief arguing that both PWC as successor to Simon, as assignee for the benefit of Westfed's creditors, and Westfed are real parties in interest in this case. Brief of Westfed Holdings, Inc. ("Westfed") Addressing the Real–Party–in–Interest Issue Identified by the Court's Order of July 10, 2001 (Westfed Party–in–Interest Brief) at 1.

Defendant argues that no party other than Westfed is entitled to assert Westfed's claims. Defendant's Response to the Brief of Westfed Holdings, Inc. Addressing the Real–Party–in–Interest Issue Identified by the Court's Order of July 10, 2001, and Opposition to the Motion of Westfed Holdings, Inc. to Substitute PricewaterhouseCoopers LLP, Assignee for the Benefit of Westfed Creditors, for Dennis I. Simon (Def.'s Subst. Opp.) at 1–3.

Westfed argues that the original assignment of Westfed's assets to Mr. Simon conferred real-party-in-interest status under Rule 17 on Mr. Simon, and that Westfed has real-party-in-interest status because Westfed retained an interest in the outcome of the litigation. Westfed Party–in–Interest Brief at 2. Westfed points out that the assignment of assets provided that any excess of proceeds after the payment of administrative expenses and the discharge of Westfed's debts would be paid to Westfed. *Id.* at 2.

The retained interest in recovery proceeds, Westfed argues, results in a partial assignment that permits both the assignor and the assignee to maintain claims. *Id.* at 2–3. Defendant argues that the Assignment of Claims Act, 31 U.S.C. § 3727 (2001), forbids partial assignments under these circumstances. Def.'s Subst. Opp. at 2, 6–8.

The Assignment of Claims Act (Act), on its face, permits the assignment of a claim "only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued," none of which circumstances exists in this case. 31 U.S.C. § 3727(b) (2001). Westfed points out, however, *see* Westfed Party–in–Interest Brief at 4–5, and defendant does not dispute, *see* Def.'s Subst. Opp. at 10, that exceptions to the Act have been recognized for certain transfers by operation of law, including voluntary assignments for the benefit of creditors. *See United States v. Shannon,* 342 U.S. 288, 292, 72 S.Ct. 281, 96 L.Ed. 321 (1952). Defendant argues that the rationale for exceptions to the Act for transfers by operation of law does not apply here. Def.'s Subst. Opp. at 10–11.

■ The exception to the Act for transfers by operation of law was explained in *Goodman v. Niblack,* 102 U.S. 556, 26 L.Ed. 229 (1880). There, the Supreme Court noted that when a transfer by operation of law is at issue, "there can be no purpose in such cases to harass the government by multiplying the number of persons with whom it has to deal, nor any danger of enlisting improper influences in advocacy of the claim." *Id.* at 560. The Supreme Court went on to liken a "voluntary assignment for the benefit of his creditors, which is made by an insolvent debtor *of all his effects,*" to a transfer in bankruptcy. *Id.* at 560–61 (emphasis added). Many courts have noted that the purposes of the Act (or its predecessor, the Anti–Assignment Act) include protecting the United States by

4. Mr. Simon was an employee of Price Waterhouse LLP (now PricewaterhouseCoopers LLP) (PWC). Appendix to Motion of Westfed Holdings, Inc. ("Westfed") to Substitute PricewaterhouseCoopers LLP, Assignee for the Benefit of Westfed Creditors, for Dennis I. Simon (Westfed Mot. Subst. App.) at 3. A dispute arose between Mr. Simon and PWC regarding which party was the true assignee. An arbitrator decided on December 29, 1997, that PWC, rather than Mr. Simon, was the assignee for the benefit of Westfed's creditors. Motion of Westfed Holdings, Inc. ("Westfed") to Substitute PricewaterhouseCoopers LLP, Assignee for the Benefit of Westfed Creditors, for Dennis I. Simon (Westfed Mot. Subst.) at 1–2. On July 23, 2001, Westfed moved to substitute PWC for Mr. Simon as a plaintiff in this case. *Id.* at 1.

preventing the multiplication of claims against it and avoiding the possibility of payment to the wrong person. *See, e.g., Shannon*, 342 U.S. at 293, 72 S.Ct. 281 ("One of Congress' basic purposes in passing the Act was 'that the government might not be harassed by multiplying the number of persons with whom it had to deal.' "); *Spofford v. Kirk*, 97 U.S. 484, 489–90, 24 L.Ed. 1032 (1878) (identifying one of the "frauds and mischiefs [that] led to [the Act's] enactment" as "the possible presentation of a single claim by more than a single claimant, the original and his assignee, thus raising the danger of paying the claim twice, or rendering necessary the investigation of the validity of an alleged assignment"); *Keydata Corp. v. United States*, 205 Ct.Cl. 467, 504 F.2d 1115, 1119 (1974) (permitting assignment on grounds that it "will not increase the number of parties with whom the Government must deal").

 The court agrees with defendant that applying the exception to the Act in this case

would run counter to the purposes of the Act. The Supreme Court's statement in *Goodman* that a transfer by operation of law would not "multiply[ ] the number of persons with whom [the United States] has to deal" makes it clear that the Court in *Goodman* did not anticipate partial assignments of claims by operation of law.[5] *See Goodman*, 102 U.S. at 560, 102 U.S. 556. To be sure, the Act permits assignment of "any part of a claim against the United States Government or of an interest in the claim," *see* 31 U.S.C. § 3727(a)(1) (2001), but the partial assignments that the Act permits are for allowed claims, not pending claims. *See* 31 U.S.C. § 3727(b) (2001). Partial assignments of claims that have already been allowed, and for which a warrant for payment has already been issued, do not pose the same danger of complex litigation as partial assignments of pending claims. The conflict over whether Mr. Simon or PWC is the true assignee of Westfed's claims seems illustrative of the type of difficulties that the Act seeks to forestall.[6]

**5.** Westfed argues that the prohibition on claims that multiply the number of parties with which the government has to deal is not absolute, because transfers by will or by intestacy may have that result. *See* Westfed Party–in–Interest Reply at 3–4. The Supreme Court has found that involuntary transfers by operation of law are exempt from the Assignment of Claims Act, whether or not the effects (multiplication of parties, improper influences) described in *Goodman* and *Spofford* as the rationale for the exception are present in any individual case. *See United States v. Aetna Casualty & Sur. Co.*, 338 U.S. 366, 375–76 & n. 12, 70 S.Ct. 207, 94 L.Ed. 171 (1949) (rejecting argument that involuntary assignment by operation of law "must be of a kind that will not involve the Government in the procedural difficulties previously referred to" and noting that "transfers by will or intestacy . . . would obviously multiply the persons with whom the United States must deal and might very well embroil it in conflicting claims."). Here, however, the assignment in question is not by operation of law, but rather is a voluntary assignment analogous in many respects to a specific transfer by operation of law, namely, a transfer in bankruptcy. *See Shannon*, 342 U.S. at 292, 72 S.Ct. 281. When the Supreme Court originally broadened the exemption for transfers in bankruptcy to voluntary assignments for the benefit of creditors, it did so based on a finding that such voluntary assignments did not pose the dangers against which the Act was to guard. *See Goodman*, 102 U.S. at 560–61. The Supreme Court has never stated that the exemption should be extended to voluntary assignments when, as here, they involve

additional parties and the possibility of conflicting claims, and the court will not draw that inference.

**6.** Westfed argues that the Supreme Court in *Goodman* must have been aware that an assignment for the benefit of creditors may result in the concurrent prosecution of a claim by both the assignor and the assignee. Reply Brief of Westfed Holdings, Inc. ("Westfed") Addressing the Real–Party–in–Interest Issue Identified by the Court's Order of July 10, 2001 (Westfed Party–in–Interest Reply) at 2. Westfed argues, citing *Bartlett, Reid & Co. v. Teah*, 1 F. 768 (C.C.E.D.Ark.1880), that the partial nature of a voluntary assignment for the benefit of creditors was well known when the Supreme Court decided *Goodman*. Westfed Party–in–Interest Reply at 2. The court does not believe that *Bartlett* clearly stands for the proposition that a voluntary assignment for the benefit of creditors permits the assignor and assignee to pursue the same claim independently. The Circuit Court in *Bartlett* defined an assignment for the benefit of creditors as "a transfer by a debtor of some or all of his property to an assignee in trust, to apply the same, or the proceeds thereof, to the payment of some or all of his debts, and to return the surplus, if any, to the debtor." 1 F. at 770 (internal quotation and citations omitted). The *Bartlett* court's acknowledgment that the assignor retains an interest in the outcome of the assignment (because any surplus should be returned to the assignor) is not equivalent to a statement that the

The Court of Claims found in a case analogous to this one that limited assignments do not satisfy the Act or its predecessor. *See Patterson v. United States,* 173 Ct.Cl. 819, 354 F.2d 327, 329 (1965) (stating that the *Goodman* exception in receivership context applies only to " 'general' receivers—those who ha[ve] been appointed receiver of all the assets of the original claimant"); *George Howes & Co. v. United States,* 24 Ct.Cl. 170, 183, 1800 WL 1624 (1889) ("[T]he courts recognize as exceptions to the operation of the [Act] only those assignments made necessary by the actual death of the creditor, those provided for under general laws in case of his civil death as to all his estate by proceedings in bankruptcy, and those, in analogy to the latter, made by voluntary transfer of all his property for the benefit of all his creditors."). The Court of Claims in *Howes* referred specifically to *Goodman's* emphasis on a debtor's transfer *"of all his effects"* as a requirement for a valid assignment. 24 Ct.Cl. at 184 (citing *Goodman,* 102 U.S. at 558–61).

For the foregoing reasons, the court finds that the assignment of Westfed's claim to Dennis I. Simon as the assignee for the benefit of Westfed's creditors was in violation of the Assignment of Claims Act and was therefore void. Because Dennis I. Simon has no interest in this case, his claims are DISMISSED for lack of standing. Westfed's Motion of Westfed Holdings, Inc. ("Westfed") to Substitute PricewaterhouseCoopers LLP, Assignee for the Benefit of Westfed Creditors, for Dennis I. Simon is therefore MOOT.

D. Standing: Whether Plaintiff–Intervenor Federal Deposit Insurance Corporation (FDIC) is Properly Before the Court

FDIC filed its complaint against defendant on March 26, 1997. The court directed FDIC to demonstrate that it had standing in light of the Federal Circuit's ruling in *Landmark Land Co. v. United States,* 256 F.3d 1365 (Fed.Cir.2001). Order of October 26, 2001 at 1. Standing presents a threshold issue of justiciability that the court must examine before addressing the substance of plaintiff's claims. *See Juidice v. Vail,* 430 U.S. 327, 331, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977). Accordingly, the FDIC must demonstrate that the case or controversy requirement is satisfied. *See* U.S. Const., art. III, § 2.

FDIC argues that the *Landmark* holding hinges on the court's finding that the FDIC's claims in that case were unrelated to the shareholder plaintiffs' claims. Plaintiff–Intervenor Federal Deposit Insurance Corporation's Post–Argument Brief (FDIC's Post–Arg. Brief) at 2. FDIC contends that this case differs from *Landmark* in the "critical respect" that "here the Shareholder Plaintiff is asserting derivative [claims for avoided costs of liquidation] and takings [7] claims that belonged to the failed Thrift, and now belong[ ] to the FDIC." FDIC Post–Arg. Brief at 3.

However, Westfed's position has consistently been that it has direct claims against the government. *See, e.g.,* Response of Westfed Holdings, Inc. (Westfed) To Defendant's Second "Notice of Supplemental Authority" at 1. Any derivative claim Westfed asserted was pleaded in the alternative. Westfed possesses direct claims. Even if Westfed had only derivative claims, FDIC provides no authority for the proposition that it can satisfy the case or controversy requirement by converting its dispute against defendant to a dispute over ownership of claims against plaintiff, contrary to the claims set out in its complaint. *See Admiral Fin. Corp. v. United States,* 51 Fed.Cl. 366, 368 (2002).

The court also notes that FDIC's complaint filed on March 26, 1997 was untimely. FDIC has repeated arguments here that have consistently failed in this court. Persuasive recent case law has (1) rejected tolling agreements as having no legal effect in

---

assignor is a real party in interest to any suit brought by the assignee on the assignor's behalf. Nor did any other cases decided prior to *Goodman,* in the court's knowledge, make such a statement. And *Goodman,* of course, dealt with an assignment of "all [the] effects" of the debtor. *Goodman,* 102 U.S. at 560.

7. Even if FDIC could establish ownership of a takings claim, this court has rejected that a takings claim exists in this case. *See infra* subsection II.F.4. FDIC cannot establish standing by hinging itself to a dismissed claim.

the *Winstar* context; (2) decided that the FDIC as a government agency with its own legal department does not present the factual setting in which the doctrine of equitable tolling is properly invoked; and (3) rejected the view that the "relation back" doctrine could apply when the real party in interest is not suing in a derivative capacity. *See, e.g., Admiral Fin. Corp.*, 51 Fed.Cl. at 368–69. FDIC has not shown that its circumstances are distinguishable in any respect that supports a finding of timeliness.

For the foregoing reasons, FDIC's complaint is DISMISSED.

E. Motions for Summary Judgment on Contract Liability

1. Background

On June 18, 1998, Westfed moved for summary judgment on contract liability. Memorandum of Law in Support of Non–FDIC Plaintiffs' Separate Motions for Partial Summary Judgment on Contract Liability: The Bell and Western Federal Savings and Loan Transactions (Non–FDIC Pls.' MSJ) at 1. Westfed argued that the passage of FIRREA and the promulgation of regulations implementing FIRREA's requirements breached the contract by requiring New Western to comply with a capital test other than the capital test required by its contract, and by limiting the inclusion in New Western's capital of supervisory goodwill. *Id.* at 28–30. On December 22, 1997, this court ordered defendant to show cause why liability should not be found in any *Winstar*-related cases where a motion for summary judgment on liability had been or was subsequently filed (show cause order). *See Cal. Fed. Bank v. United States,* 39 Fed.Cl. 753, 779 (1997), *aff'd,* 245 F.3d 1342 (Fed.Cir.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 920, 151 L.Ed.2d 884 (2002). Defendant filed a re-

sponse to the show cause order on September 15, 1998. Defendant's Response to Show Cause (Def.'s Show Cause Opp.). On the same date, defendant filed a response to Westfed's motion for summary judgment on liability and a cross-motion for summary judgment. Defendant's (1) 50–Day Response to Non–FDIC–R Plaintiffs' Motion for Partial Summary Judgment and (2) Cross–Motion for Summary Judgment (Def.'s Opp. to Non–FDIC Pls.' MSJ.).

 Defendant argues that Westfed's claim is "derivative at root" even though Westfed was a party to the contract, because the injuries alleged were injuries to New Western rather than to Westfed. Defendant's Reply to Private Plaintiffs' Opposition to Defendant's 50–Day and 90–Day Responses (Def.'s Reply to Non–FDIC Pls.' MSJ) at 16. It is well established, however, that a shareholder of a thrift who is a party to a contract for regulatory treatment of the thrift may sue to enforce the contract, notwithstanding that the contract's promises are nominally made to the thrift rather than to the shareholder. *See Hansen Bancorp v. United States,* 49 Fed.Cl. 168, 170, 177 (2001) (stating that contract was between FSLIC, shareholder plaintiffs and representatives of the thrift, and that defendant breached its contract with shareholder plaintiffs); *Bluebonnet Sav. Bank v. United States,* 43 Fed.Cl. 69, 73–74 (1999), *rev'd on other grounds,* 266 F.3d 1348 (2001) (holding that holding company and shareholder, parties to a contract, may sue to enforce contract because regulatory forbearances were intended to benefit shareholders as well as thrift). Consistent with these decisions, the court holds that Westfed is entitled to sue directly for breach of contract.[8]

8. In defendant's response to the court's show cause order, defendant also raised general objections to the entry of summary judgment on liability in *Winstar*-related cases. *See* Def.'s Show Cause Opp. at 26–41. Defendant argued that summary judgment on liability was inappropriate in those cases where the plaintiffs relied on extrinsic evidence in support of their contract arguments. *Id.* at 34–35. Defendant also argued that courts should not enter summary judgment when "credibility determinations" are nec-

essary. *Id.* at 34. The court agrees generally with defendant's observations but notes that defendant has not argued that these considerations militate against the entry of summary judgment in this particular case. Defendant must point to the existence of a genuine issue of material fact in this case to defeat summary judgment, *see Anderson,* 477 U.S. at 250, 106 S.Ct. 2505, and the averment that summary judgment is inappropriate in certain general circumstances is not sufficient to carry that burden.

## 2. Risk of Regulatory Change

Defendant cross-moved for summary judgment on the ground that Westfed assumed the risk of future regulatory change. *See* Defendant's Supplement to its Motion for Partial Summary Judgment and its Motion to Dismiss (Def.'s Supp. MSJ) at 22–26. Defendant's argument relies on defendant's interpretation of paragraphs 1 and 8 of the Forbearance Letter issued to the chairman of Westfed on September 21, 1988 in connection with the transaction. Matters of contract interpretation are appropriate for summary judgment. *See, e.g., U.S. Test, Inc. v. NDE Envtl. Corp.*, 196 F.3d 1376, 1379 (Fed.Cir. 1999).

Paragraph 1 sets out FSLIC's promise to forbear from enforcing the regulatory capital requirement provided for in Section 563.13 of the Insurance Regulations. Response of Westfed Holdings, Inc. ("Westfed") to Defendant's "Supplement to its Motion for Partial Summary Judgment" (Westfed Resp. to Def.'s MPSJ) at 3; Def.'s Supp. MSJ App. at 609. According to Westfed, under Paragraph 1 of the Forbearance Letter, defendant agreed to forbear from certain regulatory acts so long as New Western's capital was kept at or above the approximately $95 million capital requirement. Westfed's Resp. to Def.'s MPSJ at 3.

Defendant relies on Paragraph 8 of the Forbearance Letter to support its argument that any material deviation by New Western from regulatory capital requirements was subject to FHLBB approval, thereby allocating the risk of regulatory change to Westfed. Def.'s Supp. MSJ at 22–26. Paragraph 8 of the Forbearance Letter stated as follows:

> So long as New Western is in compliance with its Modified Capital Requirement, it will be deemed in compliance with any form of minimum capital test or calculation to which it is or becomes subject pursuant to the Insurance Regulations, to the extent, in the opinion of the Board or its designee, not inconsistant [sic] with the purposes of any such regulations.

Def.'s Supp. MSJ App. at 607. Defendant argues that Paragraph 8 effectively limits the time duration of Paragraph 1 of the Forbearance Letter. Defendant urges the court to read Paragraph 8 in conjunction with and as a limitation on Paragraph 1. *See, e.g.,* Defendant's Post–Hearing Brief (Def.'s Post–Hearing Brief) at 1. According to defendant, because Paragraph 8 limited the duration of the bargained-for forbearance, the change in regulatory capital requirements effected by FIRREA is not a breach. *See* Transcript of November 7, 2001 Oral Argument (Trans.) at 58. In defendant's view, Paragraph 8 makes clear that compliance with the Modified Capital Requirement would not automatically result in deemed compliance with future regulations, but rather such deemed compliance would always depend on the regulator's assessment of plaintiff's condition and on the regulator's determination whether the deemed compliance was "not inconsistant [sic] with the purposes of any such regulations." Def.'s Post–Hearing Brief at 2–3; Def.'s Supp. MSJ App. at 609. Defendant's interpretation, plaintiff replies, makes nonsense of the promise to forbear. Post–Hearing Reply Brief of Westfed Holdings, Inc. ("Westfed") at 1–2. In response to plaintiff's argument that the transaction made no sense without the forbearance, defendant argues that plaintiff would have been willing to assume the risk of regulatory change given the almost $800 million in assistance it was receiving from the government in connection with the acquisition of Bell. *See* Trans. at 7; Def.'s Post–Hearing Brief at 3–4.

Westfed claims that Paragraph 1 is not only not limited by Paragraph 8, but that such an interpretation conflicts with the express language of the Forbearance Letter. *See, e.g.,* Post–Hearing Reply Brief of Westfed Holdings, Inc. ("Westfed") at 1. Plaintiff argues that the words "regulatory capital requirement" did not themselves constitute a defined term, but rather referred to § 2 of the Regulatory Capital Maintenance Agreement which expressed the capital requirements as referring either to the Modified Capital Requirement or to the regulatory test. *Id.* In other words, there is no basis for reading the words "regulatory capital requirement" in the Forbearance Letter as referring only to the regulatory test and not to the Modified Capital Requirement. *Id.* Westfed argues that the purpose of Para-

graph 8, including its "deemed in compliance" language, was to give Westfed affirmative rights and that those rights, which included the right to invest and the entitlement to advances, are the only rights the duration of which is conditioned by the language in Paragraph 8. Trans. at 28–30.

Westfed urges that Paragraph 1 of the Forbearance Letter contains the key promise of the contract and that Paragraph 8 does not by its terms or by any necessary implication limit or condition the terms of Paragraph 1. *Id.* at 31. Paragraph 1 of the Forbearance Letter (as subsequently amended to clarify a point not pertinent here) contains an unconditional agreement to forbear for as long as plaintiff bank met the modified capital agreement spelled out in the parties' Regulatory Capital Maintenance Agreement. Def.'s Supp. MSJ App. at 609.

> The FSLIC will forbear from taking action pursuant to Section 563.13 of the Rules and Regulations for Insurance of Accounts ("Insurance Regulations") for any failure by New Western to comply with its regulatory capital requirement provided for in Section 563.13 as long as New Western satisfies either (1) the regulatory capital maintenance requirement or (2) the net worth maintenance requirement set forth in Section 2 of the Regulatory Capital Maintenance Agreement (either of which may be referred to herein as the "Modified Capital Requirement").

Def.'s Supp. MSJ App. at 609.

■ Westfed asserts that defendant's interpretation of Paragraph 8 is not only contrary to rules of contract construction, but also contrary to the parties' intent. Trans. at 31–32. The court agrees. Defendant has made no argument which persuades

the court to read a limitation in Paragraph 8 to apply to Paragraph 1. Paragraph 8 makes no reference to Paragraph 1. "An interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless." *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed.Cir.1983). As Westfed points out, under Paragraph 1, defendant unconditionally promised to take no action pursuant to Section 563.13 of the Insurance Regulations so long as New Western maintained a net worth of approximately $95 million calculated in accordance with GAAP. Response of Westfed Holdings, Inc. ("Westfed") to Defendant's "Supplement to its Motion for Partial Summary Judgment at 5." Under Paragraph 8, Westfed received the additional benefit of being deemed in compliance with *any* form of minimum capital test or calculation "to the extent, in the opinion of the Board ... not inconsistant [sic] with the purposes of the regulation in question." *Id.* If Paragraph 1 were subject to the same proviso ("in the opinion of the Board not inconsistant [sic]"), then Paragraph 1 would have added nothing to the agreement and would have been superfluous. No contract provision should be construed as being in conflict with another "unless no other reasonable interpretation is possible." *Johnson Controls*, 713 F.2d at 1555. The fact that the promise to forbear would be illusory if the regulators could determine at any time that Westfed should no longer be deemed in compliance weighs against defendant's interpretation of the relationship between Paragraphs 1 and 8.[9]

■ While the court does not rely on an examination of the parties' motivations in its interpretation of the contract terms, the

---

9. Defendant argues that other regulatory treatment afforded by the Assistance Agreement and the Forbearance Letter provided capital protection for New Western, but that such protection did not extend to the inclusion of goodwill in regulatory capital. Def. Supp. MSJ at 25–26. For example, defendant argues, New Western was granted extensive capital loss coverage by the Assistance Agreement; the Forbearance Letter permitted New Western to hold problem assets without corresponding loss provisions; and the Forbearance Letter permitted New Western to record the value of FSLIC's promissory note

without writedown. *Id.* at 26. The same interpretive considerations apply to those regulatory treatments, however. If those forbearances were subject to change at any time, the health of New Western could have been imperiled. That the thrift was dependent on special regulatory treatment in so many respects-in an industry that defendant acknowledges to be heavily regulated, *see* Def.'s Supp. MSJ at 24–25–lends support to the view that it would have been irrational for Westfed to enter into an agreement that afforded no insulation against future regulatory change.

court notes that Westfed was the party who requested Paragraph 8 be included in the contract. Trans. at 32.[10] It seems unlikely that Westfed would have requested a proviso that would render Paragraph 1 ineffective. Plaintiff sought the addition of Paragraph 8 because the paragraph was an expansion of its rights, not a limitation on its rights. Trans. at 32–33. Paragraph 8 conferred upon plaintiff the additional benefit of being "deemed in compliance with any form of minimum capital test or calculation" if it could satisfy the discretionary proviso. *See* Westfed Resp. to Def.'s MPSJ at 5. Under this provision, had New Western been in a situation where its capitalization exceeded the Paragraph 1 GAAP test, it would, without Paragraph 8, have been out of compliance with then current regulations. In that circumstance, the added protection of the "deemed in compliance" language in Paragraph 8 would insulate Western from adverse consequences beyond the compass of Section 563.13 of the Insurance Regulations. *Id.* at n. 3. For example, Westfed points out, being out of compliance with regulatory capital requirements was ground for denial of Bank Board advances under the Insurance Regulations. *See id.* For these reasons, Paragraph 8 was sought by Westfed to provide broader potential benefits than the forbearance available absent Paragraph 8.

The Supreme Court's holding in *Winstar* counsels some skepticism of the argument that the parties allocated the risk of regulatory change to the thrift, precluding any liability on the government's part for the abrogation of regulatory forbearance agreements by FIRREA. The Supreme Court found that "it would have been irrational in this case for [one of the thrifts at issue] to stake its very existence upon continuation of current policies without seeking to embody those policies in some sort of contractual commitment. This conclusion is obvious from both the dollar amounts at stake and the regulators' proven propensity to make changes in the relevant requirements." *Winstar*, 518 U.S. at 863, 116 S.Ct. 2432 (Souter, J., plurality opinion). *See also id.* at 909–910, 116 S.Ct.

2432 ("[T]he Government's suggestion that the parties meant to say only that the regulatory treatment laid out in these documents would apply as an initial matter, subject to later change at the Government's election, is unconvincing. . . . It would, indeed, have been madness for respondents to have engaged in these transactions with no more protection than the Government's reading would have given them.").

The same considerations apply here. New Western gained approximately $116 million in goodwill as the result of the acquisition of Bell and Old Western. Defendant's Proposed Findings (Def.'s 1/4/00 PFUF) ¶ 22. The business plan for New Western submitted in connection with the acquisition projected initial GAAP capital of $166.5 million, increasing to $177.9 million after one year. Non–FDIC Pls.' MSJ App. at 848. To suppose that New Western assumed the risk of regulatory change means, *inter alia,* that it assumed the risk that considerably more than half of its initial capital might be eliminated. The business plan also projected that New Western's initial ratio of GAAP capital to liabilities would be 4.2%, and that the ratio would decline to 3.2% after three years. *Id.* Then-current regulations (from which New Western was exempt by virtue of the forbearance) forbade thrifts from reducing regulatory capital to less than 3% of liabilities. *See* 12 C.F.R. § 563.13(b) (1988) ("An institution shall not . . . reduce its required amount of regulatory capital below 3 percent of total liabilities."). According to New Western's initial projections, then, a regulatory change that abrogated its capital forbearances would instantly have taken the thrift out of regulatory compliance, with no improvement expected—indeed, with a worsening of New Western's capital position expected—during the first three years. That Westfed entered into such a transaction with no expectation that the thrift would be insulated from regulatory change in what defendant acknowledges to be a heavily regulated industry, *see* Def.'s Supp. MSJ at 24–25, appears to the court improbable if not "irrational." *See*

---

10. Defendant is itself the source of this observation. In Defendant's Status Report filed February 14, 2001, defendant notes, "Paragraph 8 is a non-standard forbearance that was requested by Westfed's predecessor, DP Holdings."

*Winstar*, 518 U.S. at 863, 116 S.Ct. 2432 (Souter, J., plurality opinion). The court finds that the contract did not allocate to the thrift the risk of regulatory change.

### 3. Conclusion

■ For the foregoing reasons, defendant's Motion for Partial Summary Judgment is DENIED with respect to its contention that no recovery should be permitted because the plaintiffs assumed the risk of regulatory change. Because defendant has raised no other contention regarding the existence of a contract between Westfed and defendant or the breach of that contract, the court finds that defendant has not shown cause why the court should not grant summary judgment to Westfed on contract liability. Westfed's motion for summary judgment on liability is therefore GRANTED. The other issues raised in defendant's Motion for Partial Summary Judgment are no longer at issue in this case. Accordingly, defendant's Motion for Partial Summary Judgment, to the extent not denied, is now MOOT.[11]

### F. Defendant's Motion to Dismiss Counts V–IX of Westfed's Second Amended Complaint

Defendant has moved to dismiss Counts V–IX of Westfed's Second Amended Complaint. Westfed has opposed defendant's motion. The court discusses the parties' arguments with respect to each disputed count.

### 1. Restitution for Breach of Contract

Count V of Westfed's Second Amended Complaint states that defendant's conduct "constitute[d] a fundamental and material breach of the Parties' agreement" and that "[c]onsequently, Plaintiffs are entitled to restitution of all benefits WestFed and Western Federal have conferred upon the United States pursuant to the contract." Second Am. Compl. ¶¶ 100–101. Defendant moves to dismiss Count V under Rule 12(b)(1) for lack of jurisdiction on the ground that Westfed may seek restitution as a contract remedy but not as a substantive claim because an equitable restitution claim is outside the court's jurisdiction. Def.'s Mot. Dism. at 18.

■ Substantive restitution claims are not within the court's jurisdiction. *W.P. Bill Atkinson Enter., Inc. v. United States*, 228 Ct.Cl. 886, 888, 1981 WL 21520 (1981) (noting that "principles of non-consensual equitable restitution, of tort law, and of contracts implied in law ... are not available ... under the Tucker Act"). To the extent that Count V asserts a substantive equitable restitution claim, the court has no jurisdiction of that claim.[12]

■ Under the law of contracts, restitution is, however, available as a remedy for breach of contract. *See Glendale Fed. Bank v. United States*, 239 F.3d 1374, 1380–81 (Fed.Cir.2001) ("Restitution is sometimes described in terms of taking from the breaching party any benefits he received from the contract and returning them to the non-breaching party."); *Restatement (Second) of the Law of Contracts* § 344 (1981) ("Judicial remedies under the rules stated in this Restatement serve to protect one or more of the following interests of a promisee: ... his 'restitution interest,' which is his interest in having restored to him any benefit that he has conferred on the other party.").

As a prayer for relief, it is proper for plaintiff to seek restitution as a remedy.[13]

---

**11.** Defendant's arguments that the stockholder plaintiffs (1) lack standing, (2) may not sue derivatively, (3) are not third party beneficiaries and (4) are not the real parties in interest are moot because the stockholder plaintiffs filed a stipulation of dismissal. *See* December 6, 2001 Stipulation of Dismissal at 1.

**12.** Restitutionary relief is appropriate for contracts implied in law. *Collins v. United States*, 209 Ct.Cl. 413, 532 F.2d 1344, 1351 (1976) ("[A] contract implied in law is one in which a duty to make restitution is implied, regardless of the lack of mutual assent, for reasons of justice and equity."). Here, the court does not have to find an implied contract because an express contract exists.

**13.** Because there is an express contract, Westfed has a claim in law for breach of contract and does not have to look to equitable claims of restitution. Westfed argues that Count V "pleads ... a restitution remedy for breach of contract [and not] some theory of contract implied-in-law." Brief of Plaintiff Westfed Holdings, Inc. ("Westfed") in Opposition to Defendant's Motion

To the extent that Count V represents a "demand for judgment for the relief to which the pleader is entitled," it is redundant with the Prayer for Relief. Because Count V does not represent a claim separate from the claim for breach of contract set out in Count I, it is not appropriately pleaded as a separate substantive count. Because Count V does not state a claim on which relief can be granted within the jurisdiction of the court, Count V is DISMISSED.

### 2. Restitution for Frustration of Purpose and Impossibility [14]

Count VI of Westfed's Second Amended Complaint states that defendant's conduct "overturn[ed] the basis of the bargain struck by the Parties and rendered performance by WestFed and Western Federal commercially impracticable and frustrate[d] its purpose." Second Am. Compl. ¶ 105. Defendant moves to dismiss Count VI on the ground that frustration of purpose is a defense to contract liability rather than a substantive cause of action. Def.'s Mot. Dism. at 21–24. Westfed argues that restitution is appropriate when a contract's purpose has been frustrated or performance is impossible. Westfed Opp. To Def.'s Dism. Counts V–IX at 5–9.

■ A party's contractual duty may be discharged when "the party's performance is made impracticable without his fault or ... by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made." *Restatement (Second) of the Law of Contracts* § 261 (1981). Likewise, a party's contractual duty may be discharged when "a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made." *Id.* § 265. Impracticability and frustration of

purpose apply when the events in question are outside the control of the parties, however, not when another party to the contract has made performance by the first party impracticable or purposeless. *Id.* ch. 11 Intro. Note ("An extraordinary circumstance may make performance so vitally different from what was reasonably to be expected as to alter the essential nature of that performance."); *id.* § 261 cmt. d ("Events that come within the rule stated in this Section are generally due either to 'acts of God' or to acts of third parties. If the event that prevents the obligor's performance is caused by the obligee, it will ordinarily amount to a breach by the latter and the situation will be governed by [breach of contract principles] without regard to this Section.").

Here, Westfed argues that its performance was made impracticable because of defendant's conduct, not because of changed circumstances or a supervening event. *See* Second Am. Compl. ¶ 105 ("This frustration of purpose is through no fault of WestFed or Western Federal, but results from action taken by the United States."). Westfed's claim is therefore for breach of contract, and the doctrines of impracticability of performance and frustration of purpose do not apply.

Westfed cites *RTC v. FSLIC*, 25 F.3d 1493, 1503 (10th Cir.1994), for the proposition that claims for both frustration of purpose and breach of contract may be entertained in the same action. Westfed Opp. To Def.'s Dism. Counts V–IX at 7. In that case, the parties had a contract for regulatory forbearances similar to the one at issue here, and the act alleged by OTS to have frustrated the purpose of the contract was the passage of FIRREA. 25 F.3d at 1503. The court found that OTS had breached the contract when it enforced FIRREA's requirements, but also

to Dismiss Counts V–IX of the Second Amended Complaint (Westfed Opp. To Def.'s Dism. Counts V–IX) at 4. Rule 8(a) provides that a complaint shall contain a "statement of the claim showing that the pleader is entitled to relief and ... a demand for judgment for the relief to which the pleader is entitled." RCFC 8(a). Rule 8(e)(2) permits a complaint to set forth separate or alternative claims in one count or in separate counts. RCFC 8(e)(2). Westfed's Second Amended Complaint contains a Prayer for Relief requesting

"restitution in an amount to be determined at trial." Second Am. Compl. at 29.

14. The title of Westfed's argument refers to Count VI as a "Claim for Restitution for Frustration of Purpose and Impossibility." *See* Westfed Opp. To Def.'s Dism. Counts V–IX at 5. However, Westfed's argument addresses both commercial impracticability and impossibility.

noted that "the result does not change" if FIRREA were assumed to be a supervening event that frustrated the purpose of the contract, because the plaintiff was entitled to restitution of the benefits conferred on OTS. *Id.* The court explicitly did not address whether FIRREA was a sovereign act, which at that time was the subject of dispute. *See id.* at 1501–02. The Supreme Court has since held that FIRREA was not a sovereign act. *Winstar,* 518 U.S. at 903–04, 116 S.Ct. 2432 (Souter, J., plurality). If FIRREA was inconsistent with the contract and was not a sovereign act, it was *a fortiori* a breach of contract. Accordingly, the holding in *RTC v. FSLIC,* which was based on the assumption that FIRREA might conceivably be construed as a supervening event that frustrated the purpose of a contract for regulatory forbearances, is not relevant to this case. Because the theories of recovery urged by plaintiff in Count VI of its Second Amended Complaint do not apply to the circumstances of this case, Count VI is DISMISSED for failure to state a claim on which relief can be granted.

### 3. Restitution for Mutual Mistake

Count VII of the Second Amended Complaint states, "The Parties assumed that Western Federal could include the supervisory goodwill it acquired through its merger with Old Western as an asset for purposes of satisfying regulatory capital requirements and that Western Federal would be permitted to utilize[ ] the Modified Capital Requirement." Second Am. Compl. ¶ 108. Count VII further states that "[t]he Parties were mistaken in their assumptions as to these facts" and that "as a result of that mutual mistake, Plaintiffs are entitled to restitution of all benefits WestFed and Western Federal conferred on the United States." *Id.* ¶¶ 109–110. Defendant moves to dismiss Count VII, arguing that the doctrine of mutual mistake is not applicable. Def.'s Mot. Dism. at 26–28. Westfed argues that its mutual mistake claim is pleaded in the alternative, applicable in the event that the court holds that the contract did not express the parties' intent. Westfed Opp. To Def.'s Dism. Counts V–IX at 2 n. 2.

Restitution may be appropriate when a "mutual mistake of material fact" yields a contract that "does not faithfully embody the parties' actual intent." *Roseburg Lumber Co. v. Madigan,* 978 F.2d 660, 665 (Fed.Cir.1992). To establish mutual mistake of fact, plaintiff must show that (1) the parties were mistaken in their belief regarding a fact (2) that mistaken belief concerned a "basic assumption on which the contract was made" and (3) the mistake "has a material effect on the agreed exchange of performances." *Restatement (Second) of the Law of Contracts* § 152 (1981); *Dairyland Power Coop. v. United States,* 16 F.3d 1197, 1202 (Fed.Cir.1994) (citations omitted). The mutual mistake doctrine is applicable when there is "a mistake of both parties at the time a contract was made." *Restatement (Second) of the Law of Contracts* § 152 (1981). The purpose of reforming a contract on the basis of mutual mistake is to make a defective writing conform to the agreement of the parties upon which there was a meeting of the minds. *Am. President Lines, Ltd. v. United States,* 821 F.2d 1571, 1582 (Fed. Cir.1987).

Here, the facts that Westfed alleges are the subject of mutual mistake-namely, the counting of goodwill for purposes of regulatory capital requirements and applicability of the modified capital requirement-are the core issues of contract interpretation that are in dispute between the parties. They are not facts about which the parties mutually agree, as defendant points out. *See* Def.'s Mot. Dism. at 27. These issues are the essence of the breach of contract claim. *See, e.g., See* Second Am. Compl. ¶ 76 ("Defendant's ... imposition of new and higher capital requirements and the exclusion of supervisory goodwill from the calculation of capital, constitutes a material breach of the express terms of the Capital Agreement."). They relate to the dispute about the parties' duties under the contract, not circumstances affecting the performance of the contract. Moreover, the regulatory environment that was the subject of the "mistake" changed after the contract was executed when FIRREA was enacted. Because there was no mutual mistake of fact in this case, Count VII is DISMISSED for

failure to state a claim on which relief can be granted.

#### 4. Takings

Defendant moves to dismiss Count VIII of the Second Amended Complaint, *see* Def.'s Mot. Dism. at 7–14, in which Westfed alleges that its property was taken without just compensation in violation of the Fifth Amendment to the U.S. Constitution. Second Am. Compl. ¶¶ 111–114. Defendant argues that the remedy for the deprivation by the United States of a government contractor's property right created by contract is an action for breach of contract. Def.'s Mot. Dism. at 7.

 The Court of Appeals for the Federal Circuit and this court have repeatedly held that the government's deprivation of a property right created by a contract with the government is a breach of contract rather than a taking. *See, e.g., Baggett Transp. Co. v. United States*, 969 F.2d 1028, 1034 (Fed.Cir.1992); *Sun Oil Co. v. United States*, 215 Ct.Cl. 716, 572 F.2d 786, 818 (1978) [15]; *Coast Fed. Bank v. United States*, 48 Fed.Cl. 402, 443–44 (2000); *Castle v. United States*, 48 Fed.Cl. 187, 219–20 (2000). When the scope of the alleged taking differs from the scope of the contract, the contractor may maintain both a takings claim and a contract claim. *Integrated Logistics Support Sys. Int'l, Inc. v. United States*, 42 Fed.Cl. 30, 34 (1998). Here, however, Westfed's takings claim states that "[t]he contractual rights of WestFed and Western Federal created by the United States in the Final Contract ... constitute valuable property rights," and that the breaching acts "constitute a repudiation and abrogation of contractual rights and effect a taking of property rights." Second Am. Compl. ¶¶ 112–113. The property rights allegedly taken were the contractual rights themselves, not a separately existing property interest. The scope of the property right was therefore identical to the scope of the contract, and Westfed's remedy is an action for breach of contract. *See Castle*, 48 Fed. Cl. at 218 ("Because the present plaintiffs have available ... contract-based claims, plaintiffs' expectations with regard to their property interests have not been contravened and the value of those interests [has] not been diminished. Accordingly, we are unable to conclude that plaintiffs have suffered a taking.").

For the foregoing reasons, Westfed is entitled to maintain a breach of contract claim, but not a takings claim.[16] Count VIII is DISMISSED for failure to state a claim on which relief can be granted.

#### 5. Due Process

 Defendant moves to dismiss Count IX of the Second Amended Complaint, *see* Def.'s Mot. Dism. at 14–15, in which

**15.** Westfed argues that *Sun Oil* was overruled by *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279 (Fed.Cir.1999) and by *Prudential Ins. Co. v. United States*, 801 F.2d 1295 (Fed.Cir.1986). Opposition of Westfed Holdings, Inc. ("Westfed") to Defendant's Motion to Dismiss Counts VIII (Taking Without Just Compensation) and IX (Due Process) of Westfed's Second Amended Complaint (Westfed Constitutional Claims Opp.) at 2–3. The court disagrees. In *First Hartford*, the Federal Circuit permitted a shareholder to maintain both a takings claim on its own behalf and a breach of contract claim derivatively on behalf of the corporation. 194 F.3d at 1287–88, 1294–95. The shareholder was not a signatory to the contract. *Id.* at 1283. A partial shareholder's property interest in a corporation that is taken by the government's breach of a contract with the corporation is not identical with the scope of the corporation's breach of contract claim. The takings claim is for the value of the shareholder's investment; the contract claim may be for the profits that the corporation would have earned,

for the sums expended in reliance on the contract and lost because of the breach, or for the corporation's expenditures in the performance of its obligations. In *Prudential*, the Federal Circuit noted that a lessor may have a takings claim when the government is a holdover tenant. 801 F.2d at 1300 n. 13. There, again, the scope of the property interest was not identical with the contractual rights; there were real property interests that existed independent of the contract for which, the Federal Circuit suggested, the plaintiff could maintain a taking claim. *Id.* Neither *First Hartford* nor *Prudential* was inconsistent with *Sun Oil*.

**16.** Defendant also moves to dismiss Westfed's request for compound interest on its takings claim on the ground that the United States has not waived its sovereign immunity on claims for prejudgment interest. Def.'s Mot. Dism. at 15–17. The court has dismissed Westfed's takings claim and therefore need not address this argument.

Westfed alleges that it was deprived of its property rights without due process of law. Second Am. Compl. ¶¶ 116–118. Defendant argues that the court has no jurisdiction of claims against the United States founded on due process. The court agrees. The Tucker Act provides that this court "shall have jurisdiction to render judgment upon any claim against the United States founded ... upon the Constitution." 28 U.S.C. § 1491(a)(1) (2001). Only those constitutional provisions that mandate the payment of money may be the subject of suit in this court. *United States v. Testan*, 424 U.S. 392, 401–02, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). The due process clause of the Fifth Amendment does not require the payment of money, and therefore may not be a basis for a claim in this court. *Montalvo v. United States*, 231 Ct.Cl. 980, 982–83, 1982 WL 25825 (1982).[17]

 Westfed argues that it may maintain a due process claim based on an "illegal exaction" theory. Westfed Constitutional Claims Opp. at 6–7. Ordinarily, an illegal exaction arises when a plaintiff pays money directly to the government and contends that the money was exacted "in contravention of the Constitution, a statute, or a regulation." *Bowman v. United States*, 35 Fed.Cl. 397, 400 (1996). The United States may also be liable for an illegal exaction when money is "paid to others at the direction of the government to meet a governmental obligation." *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572–73 (Fed.Cir.1996). Westfed has not alleged that it paid money to parties other than the government to meet a governmental obligation, and its contention that "money was prevented from coming into plaintiff's account" as a result of defendant's conduct, *see* Westfed Constitutional Claims Opp. at 7, does not state a claim for illegal exaction. The doctrine of illegal exaction requires compensation for actual payments of money and has never, to the court's knowl-

edge, been applied to compensate a plaintiff for lost opportunities to make money.

For the foregoing reasons, Count IX is DISMISSED for failure to state a claim within the jurisdiction of this court.

6. Conclusion

For the foregoing reasons, defendant's Motion to Dismiss Counts V–IX of Westfed's Second Amended Complaint is GRANTED. The court notes that notwithstanding the dismissal of Westfed's substantive claim for restitution, Westfed is entitled to seek restitution as a remedy for its claim for breach of contract as set out in Count I, consistent with its Prayer for Relief in its Second Amended Complaint. Defendant's Motion to Dismiss raises matters that are no longer at issue in this case.[18] Accordingly, defendant's Motion to Dismiss, to the extent not granted, is MOOT.

G. Westfed's Motion for Summary Judgment on Several of Defendant's Affirmative Defenses

Defendant asserted various affirmative defenses in its Answer to Westfed's Second Amended Complaint. Defendant's Answer to Westfed Holdings, Inc.'s Second Amended Complaint (Def.'s Answer) ¶¶ 125–131. Westfed moves for summary judgment on five of those affirmative defenses. Memorandum of Westfed Holdings, Inc. ("Westfed") in Support of its Motion for Partial Summary Judgment, Striking Defendant's Affirmative Defenses as Legally Insufficient, and in Opposition to Defendant's Motion for Summary Judgment on Damages (Westfed's Damages Opp.) at 2–16. Defendant opposes Westfed's motion. Defendant's Reply to Plaintiffs' Oppositions to Defendant's Motions to Dismiss and for Summary Judgment on Damages and Defendant's Opposition to Plaintiffs' Motions for Summary Judgment With Respect to the Government's Affirma-

---

**17.** Defendant also moves to dismiss Westfed's request for compound interest on its due process claim on the ground that the United States has not waived its sovereign immunity on claims for prejudgment interest. Def.'s Mot. Dism. At 15–17. The court has dismissed Westfed's due process claim and therefore need not address this argument.

**18.** Defendant's argument that the Alham, Inc.'s promissory estoppel claim must be dismissed is moot because Alham, Inc. was one of the shareholder plaintiffs that filed a stipulation of dismissal. *See* Stipulation of Dismissal at 1, filed December 6, 2001.

tive Defenses (Def.'s Damages Reply) at 10–21.

### 1. Lack of Causation

Defendant asserts "lack of causation" as an affirmative defense to Westfed's Second Amended Complaint. Defendant's Answer to Westfed Holdings, Inc.'s Second Amended Complaint (Def.'s Answer) ¶ 126. Westfed moves for summary judgment that the affirmative defense of "lack of causation" is unavailable, arguing that there can be no genuine issue of material fact that the breach was a substantial factor that caused plaintiff's damage. Post–Hearing Brief of Westfed Holdings, Inc. ("Westfed") at 1–2. Westfed asserts that the breach caused the thrift to scrap its 1988 business plan and resulted in the seizure and that both the forced abandonment of the 1988 business plan and the seizure were substantial factors in causing its loss. Trans. at 37–41.

### a. Burden of Proof on Reliance Damages

As an initial matter, the parties disagree with respect to who has the burden of proving causation when reliance damages are sought. The Restatement of Contracts provides that, when there is a breach of contract, "the injured party has a right to damages based on his reliance interest, including expenditures made in preparation for performance or in performance, less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed." *Restatement (Second) of the Law of Contracts* § 349 (1981). Westfed argues that this provision places on the breaching party the burden of proof with respect to reliance damages. Westfed Damages Opp. at 2–3. Defendant argues that the Restatement merely assigns to defendant the burden of proof to show that any or all of the claimed reliance damages would have been sustained even if the contract had been fully performed. Def.'s Damages Reply at 11–12. ▮ It is well-established that the party claiming contract damages must prove its damages. *See, e.g., Lisbon Contractors, Inc. v. United States,* 828 F.2d 759, 767 (Fed.Cir.1987) (stating that shifting burden

to defendant to prove that alleged damages were improper was "contrary to ... precedent"); *Willems Indus., Inc. v. United States,* 155 Ct.Cl. 360, 295 F.2d 822, 831 (1961) ("The claimant bears the burden of proving the fact of loss with certainty, as well as the burden of proving the amount of loss with sufficient certainty so that the determination of the amount of damages will be more than mere speculation."); *Winn–Senter Constr. Co. v. United States,* 110 Ct.Cl. 34, 75 F.Supp. 255, 259 (1948) ("These being suits for breach of contract, the plaintiffs had the burden not only of proving that there were breaches, but that they were harmed by the breaches, and the extent of the harm, within measurable limits."). A plaintiff seeking to recover reliance damages may recover "expenditures made in preparation for performance or in performance," *Restatement (Second) of the Law of Contracts* § 349 (1981), but the plaintiff must prove both that it incurred those expenditures and that it incurred them in preparation for performance or in performance. *See Zenor v. El Paso Healthcare Sys., Ltd.,* 176 F.3d 847, 866 (5th Cir.1999) (denying reliance damages on the ground that the plaintiff "has not proven any actual reliance damages or out-of-pocket expenses"); *Schaefer v. Anne Arundel County,* 17 F.3d 711, 715 (4th Cir.1994) ("We have found no evidence in the record that ... he incurred any reliance damage or changed his position for the worse."). The burden shifts to defendant pursuant to § 349 of the Restatement only with respect to proof of any losses that would have been incurred had the contract been fully performed.

Westfed argues that the law cannot at the same time require a plaintiff to prove that reliance expenditures would not have been incurred if the contract had been fully performed and require a defendant to prove that the expenditures would have been incurred in that event. Westfed Damages Opp. at 2–3. However, the burdens assigned to each party do not overlap to the extent Westfed suggests. The Restatement permits a defendant to prove "any loss" that the nonbreaching party would have sustained had the contract been performed, including, presumably, losses not sustained in the real world and

therefore not submitted by the plaintiff as reliance expenditures. *Restatement (Second) of the Law of Contracts* § 349 (1981). Of course, a defendant may also wish to show, as a defense, that expenditures submitted by plaintiff were not attributable to the contract. *See Cyberchron Corp. v. Calldata Sys. Dev., Inc.,* 831 F.Supp. 94, 117 (E.D.N.Y.1993), *vacated in part on other grounds,* 47 F.3d 39 (2d Cir.1995).

Section 349 permits a reliance recovery to be offset by losses that would have been sustained had the contract been fully performed, a consideration unrelated to putting the plaintiff back in the position he or she would have occupied if the contract had not been made. *See L. Albert & Son v. Armstrong Rubber Co.,* 178 F.2d 182, 189 (2d Cir.1949) ("On principle therefore the proper solution would seem to be that the promisee may recover his outlay in preparation for the performance, subject to the privilege of the promisor to reduce it by as much as he can show that the promisee would have lost, if the contract had been performed.") [19]

When used in the context of reliance damages, the causation inquiry concerns whether the contract undertaking itself caused the expenditures or losses in question. When used in the context of expectation damages, the causation inquiry addresses the gains that the plaintiff would have made (and, as an offset, the losses that the plaintiff would have incurred) had there been no breach. *See* Wonnell, *supra* n. 19, at 107. Restatement § 349, which incorporates both reliance and expectation elements, specifically allocates the burden of proof on the expectation aspect to defendant, but does not specifically state which party bears the burden of proof on the reliance aspect (including causation).

 Because the plaintiff generally bears the burden of proving contract damages, the court believes that the burden with respect to the reliance aspect of damages recovery under § 349 rests with plaintiff rather than with defendant. Westfed therefore must show that the expenses submitted as reliance damages were incurred in reliance on the contract, or that losses were sustained as a result of reliance on the contract, while defendant may prove, in diminution of the amount of losses proved by plaintiff, any losses that plaintiff would have incurred in the event of full performance of the contract. *See generally L. Albert & Son v. Armstrong Rubber Co.,* 178 F.2d 182, 189 (2d Cir.1949).

b. Proof of Causation

"Causation" in the context of reliance damages refers to plaintiff's burden of showing that its claimed expenditures were incurred as a result of the contract. Defendant bears the burden of proof for any contention it makes that those damages were incurred for other reasons. To the extent that defendant argues that Westfed's damages should be offset by losses that Westfed would have sustained had the contract been fully performed, defendant bears the burden of proof. Defendant's arguments may be hypothetical, provided that its hypotheses can be proven "with reasonable certainty." *Restatement (Second) Contracts* § 349.

Defendant argues that as a matter of law plaintiff has not demonstrated that its reliance damages are recoverable because plaintiff has not established that the breach of contract was the cause of the alleged reliance damages. Def.'s Damages Reply at 10–15. For that reason, defendant argues that Westfed cannot recover expenditures associated with its acquisition of Old Western or purchase of Bell under a reliance damages theory. Whether Westfed made these expenditures in reliance on the contract rather than, as defendant suggests, *see* Defendant's Oppo-

---

19. The unhandiness in practical application of reliance theories of damages has been the subject of commentary. *See, e.g.,* Christopher T. Wonnell, *Expectation, Reliance, and the Two Contractual Wrongs,* 38 San Diego L.Rev. 53, 114 (2001) ("[T]he law refuses to award reliance damages, allowing the promisor to deduct from the plaintiff's expenditures any amount the promisor can prove the promisee would have been unable to recoup had the contract been fulfilled .... The result is a hybrid remedy of 'reliance limited by expectation' which seems to be justifiable neither by reliance nor expectation theory."); Michael B. Kelly, *The Phantom Reliance Interest in Contract Damages,* 1992 Wis. L.Rev. 1755, 1763 (1992) ("The expectation interest impose[s] a cap on the amount of recovery [through reliance damages], thus forcing the plaintiff to bear any losses she would have suffered had the defendant performed.").

sition to the Surreply of Westfed Holdings, Inc. on Damages at 3–4, for its own business goals independent of the contract, is a fact as to which Westfed will bear the burden of proof at trial. Given that the allocation of that burden for purpose of this proceeding has just been accomplished in this opinion, the issue of causation of damages is not ripe for summary judgment.

### 2. Lack of Privity

Defendant asserts as an affirmative defense of "lack of privity" to Westfed's Second Amended Complaint. Def.'s Answer ¶ 127. Westfed moves for summary judgment on the affirmative defense of "lack of privity," arguing that it was a party to a contract that defendant breached. Westfed Damages Opp. at 9–11. In response, defendant refers to earlier briefing in which it argued that Westfed was not entitled to sue for breach of contract because no promises to Westfed had been breached. Def.'s Reply to Westfed Damages Opp. at 15. The court has already found (in section II.E. above) that there was a contract between Westfed and defendant and that defendant breached that contract. Accordingly, there is no genuine issue of material fact with respect to defendant's "lack of privity" affirmative defense and Westfed is entitled to summary judgment that the defense of lack of privity is unavailable to defendant.

### 3. Failure to Mitigate

■ Defendant asserts "failure to mitigate" as an affirmative defense to Westfed's Second Amended Complaint. Def.'s Answer ¶ 129. Defendant argues that "plaintiffs' failure to attempt to recapitalize [New Western] following the enactment of FIRREA" was a failure to mitigate its damages. Def.'s Damages Opp. at 15. Westfed moves for summary judgment that the "failure to mitigate" affirmative defense is unavailable, arguing that it had no obligation to mitigate because mitigation would have been excessively risky. Westfed Damages Opp. at 11–12. Defendant opposes Westfed's motion, arguing that reasonable mitigation is required even when such mitigation is not risk-free. Def.'s Damages Reply at 15–17.

The Restatement of Contracts provides that "damages are not recoverable for loss that the injured party could have avoided without undue risk, burden or humiliation." *Restatement (Second) of the Law of Contracts* § 350 (1981). Westfed cites one of the comments to § 350 of the Restatement for the proposition that an injured party "need not, for example, make other risky contracts, incur unreasonable expense or inconvenience or disrupt his business." *Id.* § 350 cmt. g; *see* Westfed Damages Opp. at 11. Comment g to § 350 addresses situations where "it is reasonable for the injured party to rely on performance by the other party even after breach" and states, "This may be true, for example, if the breach is accompanied by assurances that performance will be forthcoming." Westfed has not shown that defendant's breach was accompanied by assurances that performance would be forthcoming. Absent undisputed evidence of such assurances in the record, Westfed is not entitled to summary judgment on the basis of a theory that a nonbreaching party "need not ... make other risky contracts." Westfed Damages Opp. at 11.

### 4. Failure of Consideration

■ Defendant asserts "failure of consideration" as an affirmative defense to Westfed's Second Amended Complaint. Def.'s Answer ¶ 125. Defendant argues that Westfed failed to operate New Western in a safe and sound manner and thereby breached the contract. *Id.* at 17–18. Defendant also argues that because Westfed departed from its business plan, it failed to perform its obligations under the contract thereby discharging defendant's contractual duties. Def.'s Damages Reply at 18–19. Westfed moves for summary judgment that the "failure of consideration" affirmative defense is unavailable, arguing that defendant approved any deviations from the terms of the contract and that Westfed had no implied duty to defendant, other than a general duty of good faith and fair dealing, to operate New Western in a safe and sound manner. Westfed Damages Opp. at 13–15; *see also* Westfed's Damages Reply 12–13.

The Restatement of Contracts provides that a "material failure of performance" may temporarily "prevent[ ] performance of [another contract party's] duties from becoming due" or "discharge those duties if [the failure of performance] has not been cured during the time in which performance can occur." *Restatement (Second) of the Law of Contracts* § 237 cmt. a (1981). Defendant states that in invoking "failure of consideration," it refers to "failure of performance" as set out in § 237 of the Restatement, and that plaintiff's failure of performance "excuses" defendant's duty to perform. Def.'s Damages Reply at 17; *see also Restatement (Second) of the Law of Contracts* § 237 cmt. a ("What is sometimes referred to as 'failure of consideration' by courts and statutes . . . is referred to in this Restatement as 'failure of performance' to avoid confusion with the absence of consideration."). The court must therefore examine whether undisputed facts show there was a material failure of performance by plaintiff prior to defendant's breach.

In support of its argument that consideration failed because Westfed "failed to operate [New Western] in a safe and sound manner," defendant cites *Anderson v. United States,* 47 Fed.Cl. 438 (2000), for the proposition that an individual or entity acquiring a thrift through a supervisory acquisition has a duty to the government to operate the thrift in a safe and sound manner. Def.'s Damages Reply at 17–18.

In *Anderson,* the acquirer of the thrift in question was later convicted of various crimes, several of which involved fraud, and this court held that, pursuant to 28 U.S.C. § 2514, the acquirer had forfeited his claim for breach of contract due to his commission of fraud. 47 Fed.Cl. at 446. On summary judgment, this court found that the evidence before it showed that "the viability of the converted thrift and the integrity of those who would run it" were "critical to the FHLBB." *Id.* at 446. In light of its finding regarding viability and integrity, the court found that the agreement between the par-

ties incorporated "obligations . . . to operate the thrift in a safe and sound manner." *Id.* The court pointed to "the offer made by [the acquirers], the FHLBB resolution, and [other] FHLBB documents" as evidence that the agreement encompassed those obligations, but did not cite specific statements from those documents. *Id.* Defendant has not, however, demonstrated circumstances analogous to those in *Anderson* that might support a similar outcome in this case.[20]

In support of its argument that Westfed deviated from its business plan and that such deviation discharged defendant's contractual duties, Def.'s Damages Reply at 18–19, defendant cites the provision in the Regulatory Capital Maintenance Agreement that "[a]ny material changes in, or material deviations from, the business plan for [New Western], as submitted in the H-(e)3 Application . . . shall require the prior written approval of [FHLBB] during the five-year period following the effective date of the Assistance Agreement . . . ." Def.'s Supp. MSJ App. at 629; Def.'s Damages Reply at 18.

In response, Westfed argues that regulators must have been aware of any deviation from the submitted business plan. Reply Memorandum of Westfed Holdings, Inc. ("Westfed") in Support of its Motion for Partial Summary Judgment, Striking Defendant's Affirmative Defenses as Legally Insufficient, Westfed's Response to Defendant's New Contentions on its Motion for Summary Judgment on Damages, and Westfed's Motion for Partial Summary Judgment on the Issue of Causation (Westfed Damages Reply) at 12–13.

The court notes, however, that the Regulatory Capital Maintenance Agreement gives the thrift the burden of reporting deviations from its business plan and does not state (as Westfed's argument implies), *see* Westfed Damages Opp. 13–15, that defendant waives any objections to unreported deviations by not raising such objections promptly. *See generally* Def.'s Supp. MSJ App. at 611.

---

**20.** Defendant reads *Anderson* as holding that the safety and soundness provision of the Insurance Regulations operates as an implied guarantee in *every* goodwill contract. Def.'s Damages Reply at 17–18. The court agrees with plaintiff that

such a reading is too broad. *See* Westfed Damages Opp. at 14. Courts "do not lightly find implied obligations of any kind." *Beraha v. Baxter Health Care Corp.,* 956 F.2d 1436, 1441 (7th Cir.1992).

Westfed does not contend that the deviations were, in fact, reported. Only "material" deviations triggered the thrift's reporting requirement, and the parties have neither explained the precise nature of the deviations nor addressed whether they were "material." Westfed Damages Reply at 12. Nor is it clear whether the deviations constituted a "material failure of performance," under the terms of § 237 of the Restatement, sufficient to discharge defendant's duty to perform under the contract. Because material facts are either undeveloped or disputed with respect to, among other things, the obligations of Westfed and the acts or omissions that would constitute a breach of these obligations, Westfed is not entitled to summary judgment that the defense of failure of consideration is unavailable.

5. Waiver

Defendant asserts waiver as an affirmative defense to Westfed's Second Amended Complaint. Def.'s Answer ¶ 130. Defendant argues that when Westfed continued to accept from defendant the payments that were required by the Assistance Agreement after the breach, Westfed waived its breach of contract claim. Def.'s Damages Reply at 19–21. Westfed argues that its acceptance of continued performance by defendant concerned a separate matter from the contract breach and that it reserved its rights notwithstanding its acceptance of continued performance. Westfed Damages Opp. at 15–16; Westfed Damages Reply at 13–16.

Defendant cites *Mobil Oil Exploration & Producing Southeast, Inc. v. United States,* 530 U.S. 604, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000), for the proposition that " 'acceptance of performance under a once-repudiated contract can constitute a waiver of the right to restitution that repudiation would otherwise create.' " Def.'s Damages Reply at 19 (quoting *Mobil Oil,* 530 U.S. at 622, 120 S.Ct. 2423). But, as Westfed points out, the Supreme Court also noted in *Mobil Oil* that the performance accepted did not constitute waiver because it was pursuant to a different contract that was not the subject of the breach claim. Westfed Damages Opp. at 15 (citing *Mobil Oil,* 530 U.S. at 623, 120 S.Ct.

2423). In this case, Westfed argues that the performance of defendant that Westfed accepted was under the Assistance Agreement, while the breach it alleges in this litigation was a breach of the Regulatory Capital Maintenance Agreement, so that the type of waiver cited by defendant did not occur. Westfed Damages Opp. at 15.

■ Westfed appears to the court to be entitled to the benefit of the doctrine that a contractor's reservation of rights to bring a claim for another party's breach may defeat a finding that the contractor waived the breach. See *Ling–Temco–Vought, Inc. v. United States,* 201 Ct.Cl. 135, 475 F.2d 630, 637–38 (1973) (finding waiver and noting that the contractor had not "reserved its right to claim a breach"); *Ala. Pulp Corp. v. United States,* 48 Fed.Cl. 655, 671 (2001) ("Waiver has been found when the injured party remains silent in response to a breach, thereby misleading the other party as to intentions .... We also recognize that often a contractor purposefully and tactically declines to mention a breach, and thereby waives its claim .... But these are not the circumstances here. Every step of the way, [the contractor] registered its objection.").

■ In this case, Westfed repeatedly informed defendant (through New Western) of its intention to preserve its right to file a claim. See Non–FDIC Pls.' MSJ App. at 1015 (letter from New Western chairman to OTS official, stating that "while preserving all of its legal rights and remedies with respect to [the requirement that New Western meet FIRREA's capital requirements], Western is submitting to you the Business Plan"); *id.* at 1021 (New Western business plan, stating, "It is Western's belief that Western's capital requirements are not governed by FIRREA, but rather by the terms of written contractual agreements and resolutions binding upon the OTS .... Western intends to vigorously preserve all of its rights and remedies with respect to its legal entitlement to enjoy the benefit of its bargain"); Appendix to Reply Memorandum of Westfed Holdings, Inc. ("Westfed") in Support of its Motion for Partial Summary Judgment, Striking Defendant's Affirmative Defenses as Legally Insufficient, Westfed's Response to

Defendant's New Contentions on its Motion for Summary Judgment on Damages, and Westfed's Motion for Partial Summary Judgment on the Issue of Causation (Westfed Damages Reply App.) at 45. Because defendant was aware that New Western intended to preserve its legal remedies with respect to the abrogation of its contract, any acceptance of defendant's performance did not effect a waiver of defendant's breach.[21] Defendant has not challenged any of the factual bases for Westfed's argument to defeat waiver. Because there is no dispute of material fact in this regard, Westfed is entitled to summary judgment that the defense of waiver is unavailable to defendant.

### 6. Conclusion

In accordance with the foregoing, Westfed's Motion for Partial Summary Judgment is GRANTED with respect to defendant's affirmative defenses of lack of privity and waiver, and DENIED with respect to defendant's affirmative defenses of lack of causation, failure to mitigate and failure of consideration.

### H. Cross–Motions for Summary Judgment on Causation

Westfed and defendant have cross-moved for summary judgment on the causation of the seizure of New Western. Def.'s Damages MSJ at 29–33; Westfed Damages Reply at 16–19. Defendant argues, relying on its experts, that factors unrelated to the breach led to the seizure of the thrift. Def.'s Damages MSJ at 29–33. Westfed argues that the breach was a "substantial factor" in causing the seizure. Westfed Damages Reply at 16–17.

Because Westfed has requested reliance damages, determining causation with respect to those damages is limited to ascertaining whether Westfed's actual expenditures and losses were attributable to the contract. *Glendale*, 239 F.3d at 1382. To the extent that Westfed can show that its losses resulting from the seizure of New Western were the result of Westfed's reliance on defendant's contractual promises, it may recover those losses (less any amounts that defendant can prove plaintiff saved as a result of the breach). Westfed bears the burden of proving that its reliance on defendant's promises, and the breach of those promises, caused the losses.

### 1. Applicable Test

■ Defendant argues that plaintiff must show that its losses were caused "inevitably and naturally" by the breach. Defendant's Opposition to the Motion of Westfed Holdings, Inc. for Partial Summary Judgment on the Issue of Causation (Def.'s Causation MSJ Opp.) at 9–10. Westfed argues that it need only show that the breach was a "substantial factor" in causing the losses. Westfed Damages Reply at 16. This court has held that the "substantial factor" test governs the recovery of lost profits damages, *see Coast*, 48 Fed.Cl. at 434–35 & n. 29; *Energy Capital Corp. v. United States*, 47 Fed.Cl. 382, 395 (2000), but has not explicitly applied that standard to reliance damages. The court can discern no rationale for applying a standard to govern recovery of reliance damages more stringent than or otherwise differing from the standard applicable to recovery of lost profits.

This court has applied the "inevitably and naturally" standard to distinguish cases in which a plaintiff seeks to recover lost profits flowing directly from transactions unrelated to the contract and flowing only indirectly from the contract itself. *See Energy Capital*, 47 Fed.Cl. at 395. When the lost transactions are "independent and collateral," they do not result "inevitably and naturally" from the breach. *See Wells Fargo Bank v. United States*, 88 F.3d 1012, 1023 (Fed.Cir.1996) (denying lost profits damages "for the profits [the plaintiff] allegedly would have made on

---

21. The court notes that the preservation of legal rights and remedies was done in the name of New Western, rather than in the name of Westfed. New Western is wholly owned by Westfed Holdings. *See* Def.'s Supp. MSJ App. at 7. Given the relationship between New Western and Westfed Holdings, the court finds that New Western's repeated statements of its intentions to preserve its rights and remedies negates any inference of waiver either by the thrift or by Westfed. That New Western and Westfed Holdings would have a substantial identity of legal interests could not unfairly surprise defendant given the entities' legal and business relationship.

the additional loans it could have made" had the contract not been breached); *Olin Jones Sand Co. v. United States*, 225 Ct.Cl. 741, 1980 WL 13211 (1980) (denying recovery for damages resulting from the plaintiff's inability to obtain unrelated contracts due to third party bonding company's refusal to issue bonds); *Northern Helex Co. v. United States*, 207 Ct.Cl. 862, 524 F.2d 707, 720 (1975) (denying recovery for costs of operating plant in connection with noncontractual work during remainder of contract term).

Here, however, Westfed is not seeking lost profits on transactions that it allegedly would have entered into had the contract not been breached; the question before the court is whether the losses sustained by Westfed were suffered because of the breach or because of other factors. In that context, the court believes that the proper inquiry is whether the breach, among the factors that may be shown to have had a role in producing Westfed's damages, was a "substantial factor" in causing those damages.

### 2. Substantial Factor Test Applied to Facts of this Case

■ Defendant argues that factors other than the contract and the breach were primarily responsible for the seizure of New Western. Def.'s Damages MSJ at 29–33. Defendant argues that losses arising from Old Western's lending and real estate practices (carried on by New Western), New Western's reliance on the sale of loans for income, a recession that caused heavy loan losses, and New Western's inability to raise capital were primarily responsible for the seizure. *Id.* at 30–33. Defendant relies on its experts, W. Barefoot Bankhead and Dr. William Hamm, who assert that New Western's seizure was the result of losses attributable to risky lending practices and poor management. Def.'s Damages MSJ App. at 13–21, 172–90.

On the other hand, Westfed points to OTS's notice of seizure, which stated that New Western was seized because it was "critically undercapitalized," *see* Non–FDIC Pls.' MSJ App. at 1143, and argues that the abrogation of New Western's capital forbearances was primarily responsible for the un-

dercapitalization. Westfed Damages Reply at 16. Westfed points out that New Western was still in compliance with the contractual capital requirement when it was seized, though it was out of compliance with FIR-REA's capital requirement. *Id.* at 17. And the record indicates that New Western's level of capitalization was a primary concern that led OTS to seize the thrift. *See* Def.'s Damages MSJ App. at 823–24 (internal OTS memo shortly before seizure, noting that "there is no reasonable prospect for [New Western] to become adequately capitalized without Federal assistance" and characterizing New Western as "critically undercapitalized"). Whether New Western's undercapitalization was primarily the result of the breach, or whether other factors were sufficiently important that the breach was not a "substantial factor" is a determination that cannot be made on the record before the court in the context of summary judgment.

Because genuine issues of material fact preclude summary judgment for either party, the cross-motions for summary judgment of Westfed and defendant as to whether Westfed's losses were attributable to the seizure of New Western are both DENIED.

### I. Damages

Plaintiff seeks damages for breach of contract primarily in the form of reliance and restitution damages. *See* Second Am. Compl. at 29; *see also* Westfed's Damages Opp. at 16–34, 42–45. Defendant moves for summary judgment on all of Westfed's damages claims. Defendant's Motion for Summary Judgment on Damages and Motion to Dismiss Pursuant to the Statute of Limitations (Def.'s Damages MSJ) at 11–38. Westfed opposes defendant's motion, arguing that the record sufficiently supports its claims to defeat summary judgment. Westfed Damages Opp. at 16–45.

### 1. Reliance Damages

■ Westfed may seek to recover as reliance damages "any losses actually sustained as a result of the breach." *Glendale*, 239 F.3d at 1382. Plaintiff may recover its expenditures incurred in the performance of the contract and in preparation for perfor-

mance. *Id.* at 1383. The value of the expenditures must have been lost as a result of the breach. *See Laka Tool and Stamping Co. v. United States,* 227 Ct.Cl. 468, 650 F.2d 270, 272 (1981) ("[P]laintiff's initial efforts were wasted solely by and as a direct consequence of defendant's default on its contractual obligation .... These are out-of-pocket reliance damages."). Any benefit retained by Westfed from the expenditures made in reliance on the contract must be offset against plaintiff's damages. *See* Dan B. Dobbs, *Law of Remedies* § 12.3(1), at 51–52 (2d ed. 1993) ("[T]he reliance damages recovery is a recovery for *net* reliance loss, so the defendant is credited with any benefit the plaintiff receives from the expenditures in reliance."); E. Allan Farnsworth, *Contracts* § 12.16, at 929 (2d ed.1990) (stating that "loss avoided through salvage" should be deducted from reliance recovery).

### a. Old Western Acquisition

■ Plaintiff seeks expenditures for the acquisition of Old Western stock as part of its claim for reliance damages. Westfed's Damages Opp. at 16. Plaintiff argues that it acquired Old Western's stock and then merged Old Western with Bell to form New Western in reliance on the contract, and points out that its expenditures were made known to and approved by defendant in advance. *Id.* at 16–17. Defendant argues that the purchase of Old Western was not done in reliance on the contract, but rather was a pre-contract expenditure occasioned by an independent business decision that was accomplished prior to the contract between the parties. Def.'s Damages MSJ at 16, 17. Defendant relies on the fact that Westfed submitted its application to defendant to acquire Bell two days after Old Western's shareholders approved the sale of that institution. *Id.* at 17. Defendant argues that Westfed committed itself to make the expenditures associated with Old Western prior to submitting the bid for Bell and months before the Bell acquisition was finalized and that Westfed's expenditures would have been incurred even in the absence of the Bell acquisition. *Id.*

The court notes significant authority denying recovery of pre-contractual expenses as reliance damages. *See generally* Gregory S. Crespi, *Recovering Pre–Contractual Expenditures as an Element of Reliance Damages,* 49 S.M.U. L.Rev. 43, 55–63 (1995); *compare Hollywood Fantasy Corp. v. Gabor,* 151 F.3d 203, 214 n. 4 (5th Cir.1998) ("The general rule is that the nonbreaching party may only recover out-of-pocket expenses incurred after the contract was formed."); *DPJ Co. Ltd. P'ship v. Fed. Deposit Ins. Corp.,* 30 F.3d 247, 250 (1st Cir.1994) ("[B]ecause reliance damages seek to measure the injured party's 'cost of reliance' on the breached contract, 'an injured party cannot recover for costs incurred before that party made the contract.'") (quoting Farnsworth, *Contracts* § 12.16, at 928 n. 2 (2d ed.1990)); *Energy Capital,* 47 Fed.Cl. at 426–27 ("[R]eliance damages are limited to those expenses incurred after an agreement has been reached."); Farnsworth, *Contracts* § 12.16, at 928 n. 2 (2d ed.1990) (stating that reliance damage theory will not allow a party to recover costs incurred before a contract was made).

Notwithstanding such authorities, courts have permitted recovery of pre-contract expenses when the defendant knew of such expenses. *See, e.g., Coastland Corp. v. Third Nat'l Mortgage Co.,* 611 F.2d 969, 979 (4th Cir.1979). Under *Restatement (Second) of Contracts* § 349 (1979), reliance interest includes "expenditures made in preparation for performance." *See also Goodman v. Dicker,* 169 F.2d 684, 685 (D.C.Cir.1948) (permitting recovery of "moneys which appellees expended in preparation to do business" under a promised franchise); *Sec. Stove & Mfg. Co. v. Am. Ry. Express Co.,* 227 Mo.App. 175, 51 S.W.2d 572, 577 (1932) (granting pre-contractual expenses as reliance recovery on the ground that "[t]he whole damage ... was suffered in contemplation of defendant performing its contract, which it failed to do, and would not have been sustained except for the reliance by plaintiff upon defendant to perform it").

Allowing a claim for these types of expenditures seems to make particular sense in the *Winstar* context. First, generally speaking, the Federal Circuit has indicated a preference for reliance damages as opposed to

other damages remedies in this context. *See, e.g., Glendale Fed. Bank v. United States,* 239 F.3d 1374, 1383 (Fed.Cir.2001) ("Reliance damages will permit a more finely tuned calculation of the actual losses sustained by plaintiff as a result of the Government's breach."). Second, the Federal Circuit has focused less on when the contract was executed and more on whether the damage was foreseeable:

> In order to ... [recover] ... reliance damages ... plaintiff's loss must have been foreseeable to the party in breach at the time of contract formation.... "Loss may be foreseeable as a probable result of a breach because it follows from the breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know." In order to be entitled to reliance damages, a plaintiff must prove that both the magnitude and type of damages were foreseeable .... [To be foreseeable] "the injury that occurs must be one of such a kind and amount as a prudent man would have realized to be a probable result of his breach."

*Landmark Land Co. v. United States,* 256 F.3d 1365, 1378 (Fed.Cir.2001) (citations omitted).

Third, courts have recognized and applied the Restatement concept of recovering reliance interest that includes preparation to perform in the *Winstar* context. *See, e.g., Glendale,* 239 F.3d at 1383 ("A party may recover expenses of preparation of part performance, as well as other foreseeable expenses incurred in reliance upon the contract. ... [T]he injured party has a right to damages based on his reliance interest, including expenditures made in preparation for performance or in performance") (internal quotations and citations omitted). *See also Glass v. United States,* 47 Fed.Cl. 316, 326 (2000) (permitting recovery of accounting and legal fees expended in preparation for merger), *vacated in part on other grounds,* 258 F.3d 1349 (Fed.Cir.2001).

Here, the Assistance Agreement anticipated that Bell would be merged with Old Western. Def.'s Supp. MSJ App. at 7–8. West-fed could not consummate the transaction without first acquiring Old Western. It therefore appears to the court that the acquisition of Old Western may be shown to have been part of the transaction that was the subject of the contract between Westfed and defendant. Defendant was aware of, and had to approve of, the transaction. Accordingly, the court determines that Westfed is not precluded from proving that sums expended in connection with the acquisition of Old Western are properly includable in its reliance damages.

### b. Bell Acquisition

██ Defendant argues that Westfed incorrectly claims $20 million in reliance damages for the purchase price of Bell. Def.'s Damages MSJ at 15. Defendant argues that the purchase price of Bell was in fact zero, and that the $20 million in question represented an infusion of capital into New Western. *Id.* However, the key determination at this juncture is not the amount of the expenditure, but whether the expenditure was incurred in reliance on the contract. Defendant argues that the "$20 million contributed by Westfed to [New Western] at the time of the Old Western and Bell acquisitions was to support growth resulting from the Bell acquisition, which Westfed anticipated regardless of the Bell acquisition." Defendant's Post–Hearing Brief at 10. Defendant's position is that the acquisition of Bell and merger with Old Western was undertaken as part of Westfed's independent business strategy, not in reliance on the contract. *See, e.g., id.* at 10 ("Westfed's acquisition of Bell and merger with Old Western was part of its independent business strategy to grow Old Western and utilize the tax shelter provided by Bell's net operating loss carry forwards ... to off-set [New Western's] projected profitability."). Because there is a dispute as to whether or not the acquisition of Bell and its merger with Old Western were motivated by an independent business decision on the part of Westfed or in reliance on the contract, the issue is not ripe for summary judgment.

### c. Interest

██ Westfed seeks recovery of its pre— and post-breach interest obligation on its

bonds, its interest payments, and its payments-in-kind to bondholders after the recapitalization of New Western.[22] Def.'s Damages MSJ App. at 429–30; Westfed's Post–Hearing Brief at 12–15. Defendant argues that Westfed is not entitled to recover interest as reliance damages, both because the interest incurred does not represent an actual expenditure and because Westfed may not recover prejudgment interest in this court. Def.'s Damages MSJ at 23–27. Westfed argues that the interest it seeks is not prejudgment interest, but an expenditure it made in reliance on the contract, that just happens to be in the form of interest. *See, e.g.,* Westfed Damages Opp. at 34.

Interest on a claim against the United States is precluded under 28 U.S.C. § 2516(a) (1994) unless permitted under a contract or Act of Congress. Plaintiff contends that the "interest" it seeks is not the "interest on a claim" barred under 28 U.S.C. § 2516(a), but is a "claim *for* interest incurred as the consequence of a breach." Westfed Damages Opp. at 30. Plaintiff argues by analogy to areas of law such as antitrust and RICO where a distinction "between interest as an element of damages and 'interest on a claim' " is well-recognized. *Id.* at 31. In these areas, plaintiff finds support for its argument that its bond debt and incurrence of bond debt are compensable reliance damages. *See, e.g., Pacific Gas & Elec. Co. v. Howard P. Foley Co.,* Civ. No. 85–2922SW, 1993 WL 299219, at *4 (N.D.Cal. July 27, 1993) ("The mere fact that [ ]damage can be computed in terms of 'interest' does not make it impermissible prejudgment interest."); *United Power Ass'n v. L.K. Comstock & Co.,* Civ. No. 3–89 766, 1992 WL 402906, at *8 (D.Minn. Oct.27, 1992) ("[T]he court finds that the cost of borrowed funds is a separate and compensable element of actual damage."); *Minpeco, S.A. v. Hunt,* 686

F.Supp. 420, 425–27 (S.D.N.Y.1988) ("[Interest on a loan] is an actual expense, a claim for actual damages which should be treated like any other damage claim.").

The court agrees that the "interest" Westfed seeks to recover is not prejudgment interest. Westfed seeks to recover a cost expended in reliance on the contract in the form of interest. Such a characterization has been accepted by recent case law in this court. In *Bank United of Tex. v. United States,* 50 Fed.Cl. 645 (Fed.Cl.2001), the court permitted interest paid on a loan and senior notes because the "plaintiff would not have incurred such added *interest cost* had defendant not breached." *Id.* at 665 (emphasis added). The court concluded that plaintiff was entitled to recover the total actual costs incurred in mitigating the lost leverage capacity caused by FIRREA, and that cost included interest. *Id.*

Under the Federal Circuit's decision in *Glendale,* reliance damages are recoverable upon a showing of foreseeability. *Glendale,* 239 F.3d at 1383. Westfed argues that its original negotiations with defendant and its application for approval of the transaction were "predicated expressly" on Westfed's borrowing $60 million. Plaintiff's Post–Hearing Brief at 12. Because defendant approved that application, Westfed argues that the bond interest and incurrence of bond debt were in reliance on the contract and that such reliance was clearly foreseeable. *Id.* Westfed also contends that when FIRREA's capital requirements were imposed on New Western, Westfed ultimately had insufficient funds to pay interest on the bonds and was forced to restructure the bonds at a higher rate. *Id.* at 14.

 Although the court is persuaded that defendant should not be granted summary judgment with respect to interest actually

---

**22.** Westfed argues that in its original negotiations with defendant and the approval of the transaction were predicated on the fact that Westfed planned to invest $220 million, $60 million of which defendant knew would be borrowed. Plaintiff's Post–Hearing Brief at 12. In fact, Westfed argues, defendant approved a separate application concerning the $60 million bond offering that specified the interest to be paid. *Id.* Thus, plaintiff argues, its payment of bond interest and incurrence of bond debt were both made in reliance on the contract. *Id.* Westfed also contends that when FIRREA's capital requirements were imposed on New Western, OTS deemed the thrift out of compliance and refused to allow it to pay dividends. *Id.* at 14. As a result, plaintiff argues, Westfed ultimately had insufficient funds to pay interest on the bonds and was forced to restructure the bonds at a higher rate. *Id.* at 14.

paid and payments-in-kind to bondholders after the recapitalization of New Western, Westfed cannot recover its unpaid interest.[23] Only those amounts actually expended in reliance on the contract may be recovered as reliance damages. *See Glendale*, 239 F.3d at 1382 ("The underlying principle in reliance damages is that a party who relies on another party's promise made binding through contract is entitled to damages for any losses *actually* sustained as a result of the breach of that promise.") (emphasis added).

■■■ As with any reliance damage issue, the court will need to determine at trial if these interest costs are recoverable based on a showing that the breach was a substantial factor in causing the loss. *See Bluebonnet*, 266 F.3d at 1356. In that connection, for example, as Westfed points out, the court needs to determine whether "[New] Western, in a non-breach world, would have had ample funds to pay dividends to Westfed sufficient to pay interest on the bonds without refinancing." Plaintiff's Post–Hearing Brief at 15. Genuine issues of material fact preclude summary judgment for either party with respect to interest expenses actually incurred. Defendant is, however, entitled to summary judgment that Westfed cannot recover reliance damages for interest it did not in fact pay.

### 2. Restitution

■■■ Westfed seeks restitution of all benefits conferred on the United States by Westfed or New Western pursuant to the contract. Second Am. Compl. ¶ 101. Westfed bases its claim for restitution on liquidation costs that defendant purportedly saved when Westfed acquired Bell. Westfed's Damages Opp. at 44.

Defendant's position is that the Federal Circuit's decision in *Glendale* rules out these types of loss avoidance damages. Def.'s Damages MSJ at 33. Plaintiff's position is that *Glendale* only rules out loss avoidance damages that are too speculative. *See* Westfed Damages Opp. at 42. Plaintiff argues that the court in *Glendale* would not have spent time analyzing whether or not the

costs were too speculative if there were no basis to recover loss avoidance damages in the first place. *Id.* at 42.

The court's reading of *Glendale* is that the Federal Circuit disfavors restitution measured by the benefit conferred on the breaching party in the *Winstar* context because of the difficulty of measuring such benefits accurately. Specifically, the Federal Circuit determined that it was not certain that liquidation was the Government's only alternative absent the merger effected by the *Glendale* plaintiff because the *Glendale* plaintiff was only one of a number of potential acquirers. *Glendale*, 239 F.3d at 1382. The Court of Appeals also noted that, after the *Glendale* merger, interest rates declined, allowing the thrift industry to escape projected doom with the result that the Government was not ultimately called upon to cover the potential losses. *Glendale*, 239 F.3d at 1382. The same type of uncertainty as to whether liquidation was defendant's only option is present here, although plaintiff has carefully identified factors in its situation that are in some ways potentially distinguishable from the circumstances in *Glendale*. For example, plaintiff points out that "defendant had been attempting to market Bell for three years ... by year-end 1986 Bell's deficit had climbed to $256.6 million [and] by mid–1988 ... [the] deficit had more than doubled to nearly $600 million." Westfed Damages Reply at 42. Plaintiff also makes a strong challenge to defendant's assertion that it could have sold Bell's deposits at a premium. *Id.* at 42–43.

The court does not find this issue ripe for summary judgment because there are genuine issues of material fact about the existence of an alternative to liquidation. Although the court permits the issue to go to trial, the court notes that restitution measured by benefits conferred appears to be disfavored as a remedy. Plaintiff bears the burden of demonstrating that damages so measured are more than speculative. *See Glendale*, 239 F.3d at 1382 ("This case ... presents an illustration of the problem in granting restitution based on an assumption that the non-breaching party is entitled to the supposed gains received by the breaching party, when

---

**23.** It will be up to Westfed to prove at trial which types of interest it actually paid.

those gains are both speculative and indeterminate. We do not see how the restitution award granted by the trial court, measured in terms of a liability that never came to pass, and based on a speculative assessment of what might have been, can be upheld; accordingly we vacate the trial court's damage award on this theory.").

### 3. Conclusion

For the foregoing reasons, defendant's Motion for Summary Judgment on Damages is DENIED except with respect to damages for interest not actually paid, as to which damages the motion is GRANTED.

### III. Conclusion

In accordance with the foregoing, the court orders the following:

• The court VACATES its order of September 3, 1993 adding Dennis I. Simon as a plaintiff and DISMISSES him from the case.

• FDIC's complaint is DISMISSED. There being no just reason for delay, in accordance with RCFC 54, the Clerk of the Court shall enter final judgment for defendant with respect to FDIC's complaint.

• Defendant's motion for partial summary judgment is DENIED with respect to its argument that plaintiff assumed the risk of regulatory change. Accordingly, Westfed's motion for summary judgment on contract liability is GRANTED. Defendant's motion for partial summary judgment, to the extent not denied, is MOOT in accordance with footnote 11 above.

• Defendant's motion to dismiss counts V–IX of Westfed's Second Amended Complaint is GRANTED. Defendant's motion to dismiss, to the extent not denied, is MOOT in accordance with footnote 18 above.

• Westfed's motion for partial summary judgment is GRANTED with respect to defendant's affirmative defenses of lack of privity and waiver and DENIED with respect to defendant's affirmative defenses of lack of causation, failure to mitigate and failure of consideration.

• The parties' cross-motions for summary judgment on causation are DENIED.

• Defendant's Motion for Summary Judgment on Damages is DENIED except with respect to damages for interest not actually paid, as to which damages the motion is GRANTED.

IT IS SO ORDERED.